DANIEL H. HORNE

*v.*

GRANVILLE S. INGRAHAM *et al.*

*Filed at Ottawa May 9, 1888.*

1. ACTION OF ACCOUNT—*as between partners.* The action of account provided for by our statute may be maintained by one partner against another partner or partners, to settle and adjust partnership accounts, and may be so maintained immediately upon the dissolution of the partnership, and without any previous adjustment of the accounts.

2. LIMITATION—*equity following the law.* Where there is a legal and also an equitable remedy in respect to the same subject matter, the latter is under the same statutory bar as the former.

3.  SAME—*bill for an accounting, as between partners.* So a bill in equity for an accounting of partnership affairs, filed by a member of the partnership, after an action of account might have been maintained by the same person for the same accounting, which has been barred by limitation, will be barred by the same limitation.

4.  SAME—*when the statute begins to run—in respect to an accounting between partners.* The Statute of Limitations can only be pleaded against an accounting sought by one partner against another after the partnership has been dissolved. It does not begin to run during the continuance of the partnership. Although a partial settlement is had, but the partnership is continued as to property not disposed of, the statute does not begin to run during the continuance of such relation.

5.  SAME—*of the period of limitation—on bill for an accounting.* Under the law in force in 1868, a bill for a partnership account, based upon a written agreement for a partnership, would not be barred until sixteen years after the right of action accrued.

6.  SAME—*in respect to trusts.* In case of an express trust, the Statute of Limitations does not apply until the trust is disavowed by the trustee, and an adverse right or interest is insisted upon, and made known to the *cestui que trust.* A suit to enforce the trust will, during its pendency, stop the running of the statute, and a withdrawal of the disavowal and an acknowledgment of the trust by the trustee will do away with the limitation of the statute up to that time.

7.  STATUTE OF FRAUDS—*express trust—not in writing.* An express trust attempted to be created by the holder of the legal title to land is void under the Statute of Frauds, when it is not declared or created by some instrument in writing signed by him.

8.  POWER OF ATTORNEY—*by one partner to another—construed, as to the extent of the power given.* Two persons entered into co-partnership in the purchase and sale of land, and one gave the other a power of attorney to sign the name of the former "to any instrument in any and all business pertaining to the real estate business, or otherwise, that" the latter might desire: *Held,* that the power of attorney was to enable the one to whom it was given to carry out the agreement and to transact the business therein provided for, and the general words should be construed and limited accordingly.

9.  In such case, where the partnership agreement gave each partner a one-half interest in the profits realized, the power conferred upon the one to sign the name of the other to any instrument in any and all matters pertaining to their business, did not authorize the holder of the power to take an outside party into the firm and give him an equal interest, or to sign an agreement for the creation of a trust to be vested in one partner for the benefit of the other.

10.  TRUST—*whether a trust arises—partnership dealings in real estate.* A and B formed a partnership for the purchase and sale of lands, A to ad-

vance the means with which to make the purchases, which was first to be repaid him, with interest, and the profits were to be equally divided. B, without the knowledge, consent or authority of A, made an agreement with C to take him in as an equal partner in the profits. Afterward A purchased one hundred and sixty acres of land, taking the title in his own name, without any knowledge of B's agreement with C, the latter acting as the agent of the owner of the land in making the sale to A. Shortly after, A wrote to B in reference to C's connection with the purchase, saying, "we must give him an interest in the net proceeds:" *Held*, that this expression, most favorably construed for C, was nothing more than a suggestion that he should have an interest in the proceeds, and was not evidence that A held one-third of the land in trust for C. Verbal declarations of A that C was interested in the land, are not enforceable in equity.

11. A gave to B a writing, which certified that the former thereby gave the latter an equal interest in the business of buying and selling real estate, and all business pertaining to the handling of real estate, after paying all expenses attending such business, ten per cent interest being allowed for all moneys advanced as purchase money. Afterwards A purchased one hundred and sixty acres of land, taking the conveyance to himself. In several of his letters to B he spoke of the land as belonging to them: *Held*, that under the written agreement, as soon as the one hundred and sixty acres of land was purchased, an express trust attached to one-half the land in favor of B, subject to the terms and conditions of such agreement.

12. In such case, any verbal statement of A that B's connection with him in the business was only to continue until the former should realize profits to a certain amount, was merged in or abrogated by the written contract of partnership, which, after its execution, fixed the rights of the parties.

13. RESULTING TRUST—*in whose favor*. Where a party purchases land in his own name, and pays the entire consideration with his own means, there can be no resulting trust in favor of another.

14. PARTNERSHIP *dealings in lands—contract construed.* Under a partnership agreement between A, B and C, that all land transactions during a year named, "which may be negotiated by the said C, and for which the purchase money shall be furnished by the said A," shall be for the mutual benefit of all and on their joint account, and shall be settled between all by giving one-third share of the profit or loss to each after paying A ten per cent interest on cash advanced, before C can have an interest in a certain tract bought by A, it must appear he negotiated for the purchase of that tract for the "mutual benefit and joint account" of the parties to the contract. If C negotiated the sale of a tract as the agent of the vendor, he will have no interest in the same as against A, the grantee of his principal.

APPEAL from the Superior Court of Cook county; the Hon. GWYNN GARNETT, Judge, presiding.

Messrs. FRENCH & MAY, and Mr. J. S. HUEY, for the appellant:

When the remedy at law is barred, it will be in equity. 1 Story's Eq. Jur. secs. 529, 1520, 1028a; *Hancock* v. *Harper,* 86 Ill. 446.

When the account has not been stated or the partnership dissolved, or when the subject matter of the partnership and the relations of the partners are such that an action of account is not adequate and effectual to adjust their rights, and could therefore not lie, the five years' statute of limitations will not bar a suit in equity to adjust the rights of the partners. Angell on Limitations, sec. 26; 1 Story's Eq. Jur. sec. 529; 2 id. sec. 1520.

The statute does not begin to run against an express trust until such trust has been disavowed. Perry on Trusts, secs. 883, 884; Angell on Limitations, pp. 161, 162; Wood on Limitations, secs. 210, 212. In such case, the limitation would be twenty years. 2 Story's Eq. Jur. sec. 1520.

The purchase of this tract, therefore, under the agreement of August 29, 1868, and the taking of the title thereto in the name of Granville S. Ingraham, for the joint benefit of the three partners, created an express trust in him, by the very terms of the contract, in favor of the other two, against which the Statute of Limitations would not begin to run until such trust had been openly disavowed, and could not bar Horne's right of action until after the expiration of twenty years from the time of such open disavowal. Perry on Trusts, secs. 863, 864; Wood on Limitations, secs. 210, 212; 2 Story's Eq. Jur. sec. 1245; *Cholmondeley* v. *Clinton,* 2 J. & W. 177; *Buchan* v. *Summer,* 2 Barb. Ch. 165; *Kane* v. *Bloodgood,* 6 Johns. Ch. 110; *Whaling Co.* v. *Borden,* 10 Cush. 458; Angell on Limitations, pp. 161, 162.

This trust was manifested and approved by a writing signed by him, the party taking the title, and was otherwise estab-

lished and defined by parol evidence, and is therefore valid and operative. *Kingsbury* v. *Wall*, 68 Ill. 311.

The purchase of this State street property under this last writing or agreement, therefore clearly and unmistakably created an express trust in the lands purchased, in G. S. Ingraham, in favor of Horne and William S. Ingraham, and the statutory period necessary to bar an action in relation to the same would be twenty years after disavowal. Perry on Trusts, secs. 863, 864, and notes; 2 Story's Eq. Jur. sec. 1520; Wood on Trusts, sec. 212; *Patterson* v. *Brewster*, 2 Edw. Ch. 352; *Dudley* v. *Littlefield*, 21 Me. 418; *Pierce* v. *McClellan*, 93 Ill. 245; *King* v. *Hamilton*, 16 id. 190; *Smith* v. *Gear*, 59 id. 381.

The business of the partnership, therefore, remains unsettled and its affairs unadjusted, and must necessarily remain so until the lands have been sold, and the statute can not run. Parsons on Partnership, pp. *270-285; 1 Story's Eq. Jur. secs. 659-665; 5 Leigh, (Va.) 583; *King* v. *Hamilton*, 16 Ill. 190; *Gleason* v. *White*, 34 Cal. 263.

Under these circumstances, therefore, the relations between these parties, during all this period, was that of a continuing partnership or continuing trust. Wood on Limitations, sec. 210, and references; Parsons on Partnership, p. 368; *Kane* v. *Bloodgood*, 6 Johns. Ch. 110; *Wallace* v. *Duffield*, 2 S. & R. 529; *Piatt* v. *Vattier*, 9 Pet. 416; 2 Barb. Ch. 165; 5 Metc. 562; *Gleason* v. *White*, 34 Cal. 263.

Messrs. FLOWER, REMY & HOLSTEIN, for Granville S. Ingraham:

The right of action accrued upon the contract of June 2, 1868, more than sixteen years prior to the filing of his cross-bill, and the same is barred by section 16, chapter 83, of the Revised Statutes. Under that agreement the parties became partners, and a right of action for an accounting accrued to them more than five years before this action, and it is barred by section 15 of the Limitation act.

The dismissal of the bill by W. S. Ingraham, without reservation, is, in effect, a waiver of his right of action, and the great delay is a bar to equitable relief.

In equity, partnership real estate is treated as personalty. 2 Lindley on Partnership, 652, note; *Nicoll* v. *Ogden*, 29 Ill. 323; *Mauck* v. *Mauck*, 54 id. 281; *Bopp* v. *Fox*, 63 id. 540; *Morrill* v. *Colehour*, 82 id. 618; *Trowbridge* v. *Cross*, 117 id. 109.

A bill for a partnership accounting is barred after five years from the dissolution. *Quayle* v. *Guild*, 91 Ill. 378; *Hancock* v. *Harper*, 86 id. 446; *Pierce* v. *McClellan*, 93 id. 245; *Askew* v. *Springer*, 111 id. 662.

As to *laches* being a bar, see 1 Pomeroy's Eq. Jur. 460; *Rodgers* v. *Simmons*, 55 Ill. 77; *Castner* v. *Walrod*, 83 id. 173; *Cox* v. *Montgomery*, 36 id. 396; *Carpenter* v. *Carpenter*, 70 id. 457; *Maher* v. *Farwell*, 97 id. 56; *Dakey* v. *Hurlburt*, 100 id. 214; *Bissell* v. *Lloyd*, id. 214; *Dobbins* v. *Wilson*, 107 id. 17; *Hoyt* v. *Pawtucket*, 110 id. 390; *Lequatte* v. *Drury*, 101 id. 77; *Breit* v. *Yeaton*, id. 245; *Furlong* v. *Riley*, 103 id. 628; *Harris* v. *McIntyre*, 118 id. 275; *McDonald* v. *Stow*, 109 id. 40; *McKean* v. *Vick*, 108 id. 373.

Mr. FRANKLIN DENISON, for the appellee W. S. Ingraham:

As William and Granville were partners, real estate purchased could not be taken in the partnership name. *Tidd* v. *Rives*, 26 Minn. 201.

For the purpose of paying creditors and repaying the advances of either partner, real estate will be treated as personalty, but no further. *Shanks* v. *Klein*, 104 U. S. 18; *Dyer* v. *Clark*, 5 Metc. 562; *Reeves* v. *Ayers*, 38 Ill. 418; id. 394.

Surplus goes to the heirs. *Tillinghast* v. *Champlain*, 4 R. I. 174; *Estate of McAvoy*, 12 Phil. 83; *Robertshaw* v. *Hanway*, 52 Miss. 713; *Shearer* v. *Shearer*, 98 Mass. 107; 25 N. Y. 505.

There being an express written trust, the twenty years limitation law could not be urged against William, much less

than twenty years having elapsed. Nor would that limitation begin to run until the open disavowal of the trust. *Kane* v. *Herrington*, 50 Ill. 232; *Ryder* v. *Emrich*, 104 id. 470.

The contract of partnership continued as to the disposition of the land in hand, without impairing its obligation. *Robbins* v. *Laswell*, 27 Ill. 365; 17 S. & R. 165; Story on Partnership, secs. 197, 198, 278.

The contract of August 29, 1868, under which Horne claims an interest in the Dyer tract, is a contract for a contract, and does not convey an interest in real estate; nor, under the evidence, is that tract included within the terms of that contract. *Wilson* v. *Campbell*, 5 Gilm. 383; *Doyle* v. *Bailey*, 75 Ill. 418.

Mr. WILLIAM H. BARNUM, also for W. S. Ingraham.

Mr. JUSTICE MAGRUDER delivered the opinion of the Court:

Daniel H. Horne, the appellant, filed the original bill in this case against Granville S. Ingraham and William S. Ingraham, in the Superior Court of Cook County, on May 28, 1884; he filed an amended bill on July 29, 1884, a second amended bill on December 15, 1884, and a third amended bill on April 28, 1885. Upon the latter bill and the answers thereto a hearing was had as to the rights of Horne, and his bill was dismissed by the chancellor for want of equity.

The object of the bill is to get from the Ingrahams an accounting as to the proceeds of the sales of certain lands, and also to procure a conveyance from them of part of a certain other tract of land.

By deed, dated June 29, 1868, the Brighton Company conveyed to William S. Ingraham $1813\frac{42}{100}$ acres of land in Cook County, called, in the pleadings and evidence, the Brighton or Calumet tract. On the same day W. S. Ingraham and Horne and W. S. Ingraham, as attorney in fact of G. L. Ingraham under the power of attorney hereinafter mentioned, signed the following instrument:

"CHICAGO, *June 29, 1868.*

"The undersigned, William S. Ingraham, has this day purchased of N. P. Iglehart, president of the Brighton Company, $1813\frac{42}{100}$ acres of land, for the sum of $9000, and the title of said land may be taken in his name or in that of his brother, Granville S. Ingraham; and it is understood and agreed that Daniel H. Horne is to have one-third interest in the profits of said lands, after paying to said Ingraham the $9000 advanced by him for the purchase, and also interest on the same at the rate of ten per cent per annum, profits and losses on the sale of said land to be shared in the same proportion, share and share alike. Each of said W. S. Ingraham and D. H. Horne shall use their best endeavors to sell said land, but no commissions are to be charged for such services.

(Signed.)                        G. S. INGRAHAM,
                                     by W. S. Ingraham,
                                    W. S. INGRAHAM,
                                    DANIEL H. HORNE."

The whole of the $1813\frac{42}{100}$ acres, named in this contract, had been sold by the Ingrahams and Horne by the first day of November 1870. By his bill and amended bills Horne prays for an account of the sales of the different portions of said Calumet tract, and claims that, upon such accounting, a large amount of money will be found to be due to him from the Ingrahams, as his share of the proceeds of said sales under the contract of June 29, 1868.

The Statute of limitations is pleaded as a bar to the accounting asked for as to the sales of the Calumet tract. We think that it is well pleaded.

Counsel for Horne admit in their argument that the Calumet land was all sold before 1871, that various portions of it were sold by Horne himself in the summer of 1869, and that the balance of it was sold by the Ingrahams in October 1870. Horne knew of these sales at or about the time they took place. The sale made in October 1870 was to the Chicago and Calu-

met Canal and Dock Company, and Horne says he knew of this from the deed to the Company, which was dated October 21, 1870. He took no steps to get an accounting, nor to assert his claim to any portion of these proceeds of sale, until the filing of his bill in this case on May 28, 1884, allowing a period of nearly fourteen years to elapse after the accruing of his cause of action, if any he had.

Whatever may have been the rights of Horne under the contract of June 29, 1868, before the property therein described was sold, there can be no doubt that, after the sale, his only claim was a money demand. The only recourse which he then had was upon the money received from the sales of the land, or the money value of the land.

The action of account provided for by our statute may be maintained by one partner against another partner or partners to settle and adjust partnership accounts, and may be so maintained immediately upon the dissolution of the partnership and without any previous adjustment of the accounts. We have held that such action of account is barred after the lapse of five years. It might have been brought within that period by the appellant Horne for the recovery of such portion of the proceeds of the sales as he could have shown himself to be entitled to. Where there is a legal and an equitable remedy in respect to the same subject matter, the latter is under the control of the same statutory bar as the former. "A bill in equity for an accounting of partnership affairs filed by a member of the partnership after an action of account, which might have been maintained by the same person for the same accounting, has been barred by limitation, will be barred by the same limitation." The appellant, Horne, should have brought his suit for the money, claimed to be due him, within five years, the period of limitation prescribed by the statute for the recovery of money. (*Hancock* v. *Harper* 86 Ill. 445; *Quayle* v. *Guild* 91 id. 378; *Bonney* v. *Stoughton* 122 id. 536.)

Afterwards the appellant Horne executed the following declaration of trust:

"CHICAGO, *August 27, 1868.*

"This is to certify, that whereas William S. Ingraham has purchased from Silas M. Moore and James H. Stead ten acres of land, to-wit, the north-east quarter of the north-west quarter of the south-west quarter of section 35, 38, 14, for the sum of $500, and has procured the money from Granville S. Ingraham, and given it to me to pay for the same, and desires me to take the deed for the same in my own name, that I agree to hold the same land for the joint profit of the said William S. Ingraham, Granville S. Ingraham and myself, and when sold do agree to settle in accordance with the agreement between us of date June 29, 1868, in relation to Calumet lands.

(Signed.)             DANIEL H. HORNE."

Upon the lower half of the same sheet of paper, upon which the foregoing declaration of trust was written, there was also written, in the handwriting of Horne and signed by him and W. S. Ingraham and by the latter as attorney in fact of his brother G. S. Ingraham, the following instrument:

"And it is hereby understood and agreed that all land transactions during the year 1868, which may be negotiated by the said Daniel H. Horne, and for which the purchase money shall be furnished by the said Granville S. Ingraham, shall be for our mutual benefit and joint account, and shall be settled between us by giving one-third share of the profit or loss to each, after paying to said Granville S. Ingraham ten per cent interest on cash advanced. The deeds for any such purchases may be taken in either of our names.

"Witness our hands and seals this 29th day of August, A. D. 1868.

(Signed.)       WILLIAM S. INGRAHAM,       [Seal.]
                    GRANVILLE S. INGRAHAM,       [Seal.]
                       by William S. Ingraham, *Att'y.*,    [Seal.]
                    DANIEL H. HORNE.            [Seal.]"

No question arises upon the declaration of trust, dated August 27, 1868, as it seems to be conceded, that the property therein described was finally sold after much difficulty and the proceeds were divided to the satisfaction of all parties.

On October 26, 1868, 160 acres of land, located upon the east side of State street and known in the proofs and pleadings as the Dyer or State street tract, were conveyed by Dr. Dyer, the owner at that time, to Granville S. Ingraham for a consideration of $32000.00, of which $14000.00 were paid by said Granville in money or money and notes, and the remaining $18000.00 were paid in Star Metal Stock transferred to Dyer by said Granville. On February 16, 1874, Granville deeded ten acres of the Dyer tract to one Stafford for a recited consideration of $15000.00.

The appellant Horne claims that the Dyer tract was conveyed to Granville S. Ingraham under and in pursuance of the above instrument bearing date August 29, 1868, and that he is entitled to a one third interest in said tract after reimbursing Granville for his advances and interest thereon. The prayer of his third amended bill is for an accounting as to the ten acres sold; for a dissolution of the co-partnership alleged to exist between himself and William and Granville Ingraham; that Granville may be decreed to hold the title to the 150 acres remaining unsold in trust for Horne and the two Ingrahams, and that they three be declared to be the joint owners thereof, and that a partition be made between them, or a sale and division of the proceeds, etc., in case partition can not be made.

After a thorough and careful examination of all the evidence, we are satisfied that the appellant Horne is not entitled to any interest in the Dyer tract, and that the Court below committed no error in dismissing his bill for want of equity.

It is claimed by counsel for Horne, that the instrument of August 29, 1868, created an express trust in his favor in the State Street land. Under the circumstances, which surrounded the purchase of that land, Granville S. Ingraham, the grantee

and holder of the legal title, was the proper person to make whatever declaration of trust may have been made in reference thereto. The statute of frauds has been pleaded in this case. If there was any express trust in favor of Horne, it was void under the statute, for the reason that no declaration or creation of such trust was manifested by any writing signed by Granville S. Ingraham.

It is true, that William S. Ingraham signed the name of his brother, Granville, by himself as "Att'y" to the paper, dated August 29, 1868. But we do not think that he was authorized to do so by the power of attorney, under which he assumed to act.

On June 2, 1868, Granville executed and delivered to his brother, William, the following written agreement and power of attorney:

"This is to certify that I, Granville S. Ingraham, do hereby give my brother, William S. Ingraham, an equal interest with me in the buying and selling of real estate, and all business pertaining to the handling of real estate, after paying all expenses attending said business, with ten per cent interest being allowed for all moneys advanced as purchase money. Said W. S. Ingraham is to have an equal one-half interest with me in all real estate business that may be done in the year 1868.

"Dated Chicago, June 2, 1868.

  (Signed.)      G. S. INGRAHAM."

"Know all men by these presents, that I, Granville S. Ingraham, of Chicago, Cook county, Illinois, have made, constituted and appointed, and by these presents do make, constitute and appoint, William S. Ingraham my true and lawful attorney, for me, and in my place and stead, to sign my name to any instrument in any and all business pertaining to the real estate business, or otherwise, that he may desire to do, giving and granting to my said attorney full power and authority to do and perform every act and thing whatsoever, requisite and

14—125 ILL.

necessary to be done in and about the premises, as fully, to all intents and purposes, as I might or could do if personally present, with full power of substitution, hereby ratifying and confirming all that my said attorney shall do or cause to be done by virtue hereof.

"In witness whereof, I have hereunto set my hand and seal this second day of June, in the year one thousand eight hundred and sixty-eight.

"Sealed and delivered in the presence of H. M. Hayes.
      (Signed.)              G. S. INGRAHAM.    (Seal.)"

Shortly after executing these two papers Granville left the City of Chicago on account of failing health and was absent in another State when the instruments dated respectively on June 29, August 27 and August 29, 1868, were signed by Horne and William S. Ingraham.

The power of attorney above recited was executed at the same time with the partnership agreement between Granville and William, and was evidently intended to enable William to carry out that agreement and to transact the business therein provided for. He had very little if any means, while his brother Granville was a capitalist and was to furnish the money for the purchase of land. The general expressions in the power of attorney should be limited to the "clear and obvious intent and object of the agency" therein created. The language in the power was used in connection with the subject-matter of the partnership agreement and will be presumed to have related to that matter and will be construed and limited accordingly. (1 Wait's Actions and Defenses 224)

By the terms of the instrument which Horne induced William to sign on August 29, 1868, the partnership of June 2, 1868, was materially changed. As to the transactions therein named Granville's interest of one half, as fixed on June 2, 1868, was reduced to one third. A new partner was admitted into the firm in the person of Horne. Deeds to property, for

which Granville was to furnish the purchase money, might be taken in the name of Horne, a man in whom Granville had no confidence, and whose unreliable character he frequently alluded to in his letters, as set forth in the record. These extraordinary provisions, contained in the contract of August 29, do not come legitimately within the purview of the language used in the power of attorney of June 2, 1868. The power, conferred upon William to sign Granville's name to any instrument in any and all matters pertaining to their business, did not authorize him to take an outside party into the firm, to change the interests of the old members and to provide for the creation of a trust to be vested in one partner for the benefit of the others. It follows that the contract of August 29, 1868, can not be regarded as having been signed by Granville S. Ingraham.

The testimony does not show, that Granville ever ratified the act of his brother in so signing his name. The papers, signed on June 29 and on August 27 and 29, were at once taken possession of by Horne and by him kept until after the bringing of this suit. William did not take copies of them. They were never seen by Granville until after the present bill was filed in 1884. Upon his return from the east Granville was informed by William that an arrangement had been made to give Horne a third of the profits to be realized from the property described in the papers, dated June 29 and August 27, 1868, but nothing was ever said to lead him to suppose, that any instrument had been executed whose terms could be construed to give Horne an interest in the State Street property.

William swears that he did not tell his brother of having signed his name "by virtue of the power of attorney;" that he never mentioned to him the agreement of August 29, 1868; that he supposed the latter agreement, written as it was by Horne on the same sheet of paper with the declaration of trust, had reference to the ten acres purchased from Moore and Stead, in which some parties named Reed had such an interest or

title, as made a settlement with them necessary in order to save the $500.00 already invested; that he never knew that Horne had or claimed any interest in the State Street property until he said something to that effect in April 1879 or thereabouts.

To the same effect is the testimony of Granville. The conduct of all the parties shows that they never regarded Horne as having or claiming any interest in the Dyer tract. Granville and William had a settlement of some of their real estate transactions on September 25, 1871, and, while they differ in their statements in regard to its terms, they treated themselves as the only parties concerned. On June 25, 1874, William filed a bill in the Circuit Court of Cook County against his brother Granville to secure his one half interest in the Dyer tract and therein claimed that he and Granville were the sole owners, making no reference to any interest of Horne. Horne knew of the filing of this bill and was aware of its contents.

In the summer of 1869, the Ingrahams had reason to believe that Horne, who was aiding them in the sale of the Calumet property, had made some unwarranted changes in a deed given him to be delivered to a purchaser named Boynton, and that he had sold 40 acres, instead of $14\frac{76}{100}$ acres, as reported by him, and had realized $2500.00 instead of $500.00 as reported by him. This led to a rupture. There was some talk of having Horne indicted. He was notified by the Ingrahams that they would have nothing more to do with him, and that their transactions with him in handling real estate would be closed from that date. Notwithstanding this notice to Horne in the summer of 1869 of the adverse position assumed by Granville S. Ingraham, whom he claims to have regarded as his trustee holding a part of the Dyer tract for his benefit, he took no steps to assert his claim against such trustee until nearly fifteen years afterwards in May, 1884.

It is claimed, however, that the trust contended for is shown by a letter, which Granville wrote to William on October 28, 1868, in reference to the purchase of 160 acres from Dr. Dyer.

In that letter he refers to Horne's connection with the purchase and says: "*we* must give him an interest in the net proceeds." This language, construed most favorably for Horne, is nothing more than a suggestion that he should have an interest in the proceeds. It reveals no knowledge of the contract of August 29, 1868. It contains no statement that an interest has been given him and makes no declaration that he is entitled to an interest. It is the mere expression of a desire to give him a share in the proceeds. But there is no evidence that the intention here intimated was ever carried out. In *Phillips* v. *South Park Comr's* 119 Ill. 626, somewhat similar language was used in a letter, and we there held it to be insufficient as written proof of a trust.

The only writings, claimed to have been signed by Granville S. Ingraham as evidences of a trust, are the instrument of August 29, 1868, and the letter of October 28, 1868. These being disposed of, no written proof remains of the creation of any such trust.

Horne and a witness produced by him by the name of Pulling state that, on one or two occasions after the purchase of the Dyer tract, Granville spoke of himself and his brother and Horne as being all interested in that tract. The Ingrahams, in their testimony, contradict the statements thus made by Horne and Pulling. But even if Granville did use such words as are attributed to him, they were mere verbal or oral declarations, which can not be enforced in a Court of equity. (*Adams* v. *Adams*, 79 Ill. 517).

We can not see that there are, in the transactions relating to the Dyer land, any of the elements of a trust arising by implication or by operation of law. The three papers dated respectively June 29 and August 27 and 29, did not together constitute one partnership agreement. They were separate and distinct instruments, each standing by itself and each having reference to different matters.

Nor does the evidence establish that there was a parol partnership agreement existing between Horne and the Ingrahams for the transaction of a general real estate business.    Hence, the doctrine, even if sound, of such cases as *Dale* v. *Hamilton,* 5 Hare 369, which hold that, upon proof of such parol agreement, one of the partners may establish his interest in land, the subject of the partnership, "without such interest being evidenced by a writing signed by or by the authority of the party to be charged therewith," has no application here.

It is conceded that the whole of the $32,000.00 paid for the Dyer tract was advanced by Granville S. Ingraham, and, therefore, there was no resulting trust in favor of Horne.    It is claimed, however, that the tract in question was secured for the Ingrahams by the services of Horne.    This leads to a further consideration of the language of the instrument dated August 29, 1868.

Even if that instrument was properly signed by authority of Granville Ingraham and duly ratified by him, the Dyer tract can not be brought within its provisions without parol proof of an outside fact.    The land transactions therein spoken of were to be those, which should be negotiated by Horne, and for which the purchase money should be furnished by Granville. Before Horne could have an interest under the contract in the Dyer tract, it must appear that he negotiated for the purchase of that tract for the "mutual benefit and joint account" of the parties to the contract.

The testimony shows, that, before the attention of Granville Ingraham had been called to the State Street land and thereafter up to the day of his purchase of it, Horne was the agent of Dr. Dyer for the sale of that land.    He was in the employ of Dyer and Dyer had agreed to pay him a commission of $2000.00 for making a sale of the property.    When the sale was completed Dyer did pay him the commission agreed upon. The deed executed by Dyer to Granville was drawn for Dyer by Horne.    The duty, which the latter owed to Dyer, was to

get as high a price as possible for the land. The duty, which he would owe to the Ingrahams if acting for them, would be to buy at as low a figure as possible. The two positions, one of agency for the seller and the other of agency for the buyer, were inconsistent with each other. Hence, it will be presumed that whatever Horne did in the matter he did as agent for Dr. Dyer. His services must be referred to his employment by Dyer and can not be regarded as constituting that negotiation in behalf of the Ingrahams, which is called for by the contract of August 29. To hold otherwise would be to stamp the appellant, Horne, as the betrayer of a sacred trust.

We come now to the second branch of this long and complicated litigation, which has reference to the interests of the two brothers William and Granville Ingraham. In the suit begun by the filing of Horne's bill, as above stated, William Ingraham filed a cross-bill against his brother Granville on September 13, 1884, and, in lieu of such original cross-bill, which was lost from the files, he filed a substituted cross-bill on December 5, 1885. He therein claims to be the owner of one half of the Dyer tract under the agreement of June 2, 1868, and prays for a conveyance of half thereof to himself after allowing Granville for his advances and interest, etc.; that an account be taken of the ten acres sold to Stafford, and that the amount of the proceeds of such sale be applied upon the amount due for advances, etc. Granville denies that William has any interest in the property, and, among other defenses, pleads laches and the statute of limitations. The issue thus presented by the pleadings in the cross-suit is, whether William has a half interest in the Dyer tract, or whether Granville owns the whole of it. The court below decreed in accordance with the prayer of the cross-bill. We think the decree was right.

When the purchase was made from Dyer, a trust in favor of William attached, *eo instanti*, to one half of the tract under the terms and conditions of the written agreement of June 2, 1868. Subject to the provisions of that instrument Granville

held one half the land in trust for his brother. The trust arose directly, *ex contractu*, and was manifested by the writing. In addition to this, in several letters written by Granville to William, he speaks of the Dyer land as "*ours*" and as "our real estate." Moreover, it is admitted by Granville in his testimony and by his counsel in their argument, that up to September 25, 1871, William owned a one-half interest in the tract.

It is claimed, however, that on September 25, 1871, the two brothers had a settlement of their business and that, by the terms of such settlement, William's interest in the Dyer tract ceased and had no existence whatever after that date. Prior thereto they had been jointly interested in a number of pieces of real estate under their partnership agreement, but, at that time all these had been sold except the State Street property. William says that the State Street property was not embraced in the settlement then made, and Granville says that it was.

The evidence does show that there was an accounting between the brothers on September 25, 1871. It is also proven that, in this accounting, the proceeds of the sales already made were divided, or if not actually divided, an understanding was reached as to the mode of their division. The accounts made out by Granville, which were then used and passed upon, are in evidence. They contain a large number of items on both the debit and credit sides. These items refer to monies derived from sales of the Brighton or Calumet tract of $1813\frac{42}{100}$ acres, of the Oakwood tract of 160 acres, of the Moore or Reed tract of ten acres, of the Teed tract of 60 acres, of the Cass tract of ten acres. They contain no reference whatever to the Dyer tract. The accounting proceeded upon the basis of an ownership by William of one half of all the proceeds of the different sales.

The sale heretofore mentioned to the Chicago and Calumet Canal and Dock Company was for $45,000.00 in the stock of that company. William accepted from his brother in lieu of his half interest in this stock a deed for seven acres of land

in Lake County known as the Waukegan property. That deed bears date August 13, 1872, but whether the division of the stock was made at the latter date or earlier is not clear from the evidence. With the exception, perhaps, of this stock matter, the accounting of September 25, 1871, disposed of all the sales growing out of the partnership business.

In "Exhibit C," which is the summing up of all the accounts, the total amount of credits in William's favor is $39568.02 and the total debits are $28943.60, showing a balance in his favor of $10624.42. Of this balance the sum of $7755.66 was then paid to him in cash and $2868.76 in Granville's due bill, dated September 25, 1871, and due in 1, 2 and 3 years. The last installment of the due bill would appear to have been paid August 9, 1880.

William swears that, after the other matters had been thus arranged, he and Granville talked about the Dyer tract and agreed to hold it as an investment and for a future rise. His testimony is: "We both agreed that it was property to hold and that we should make no further effort to sell it; but, to use his words, 'we would let it lay as a nest of eggs well set'" etc.

All the probabilities of the case tend to confirm William's statement. As the Dyer tract had not been sold on September 25, 1871, it was difficult at that time either to determine the precise extent of each brother's interest by reason of the uncertain value of the stock paid towards the purchase, or to divide such interests, if determined, otherwise than by a partition of the land, which is not claimed by either side to have been then thought of.

No sufficient consideration is shown to have passed to William for a release of his interest in the tract. He was induced by Granville, by letters written in 1867 and the early part of 1868, to close out his business and sell his property in the State of New York, where he was then living, and to come to Chicago and assist in the real estate operations of his brother, whose health was delicate at that time. It being admitted

that William was entitled on September 25, 1871, to a half interest in the Dyer tract after deducting advances, etc., why should he part with his interest on that day, and, if he did, what did he receive in return for it? The State Street property, bought in 1868, was rapidly rising in value in 1871, and is now claimed to be worth more than $300,000.00. It was conceded at the settlement and is conceded now, that he owned a half interest, under the terms of the contract of June 2, 1868, in all the other pieces of property that had been theretofore sold and that were embraced in the accounting; and it is nowhere shown, that he was given any greater interest in the proceeds of those sales, as a consideration for releasing his rights in the State Street land.

Granville's evidence upon this subject is not satisfactory. He says in his answer: "defendant then (June 2, 1868) stated to him that if he managed the business prudently defendant would continue in business with him until complainant's profits amounted to $50.000.00 and then complainant must take care of his own business." He says in his testimony, speaking of what occurred at the September settlement: "I told him I had accomplished more than my purpose. I had told him I would stay with him until I could make $20.000.00, or he could make $20.000.00 or $50.000.00. Said I, 'You have got $67.000.00 or $65.000.00 * * * I intended to give you an interest in the State Street property, if it ever amounted to anything, but as I have done more than I agreed to, I think I shall ignore you in the State Street property' or something to that effect." All this is denied by William. We see nothing in the record to indicate that William did not possess the common prudence of an ordinary business man. No man of ordinary prudence would submit to have his rights in a valuable piece of property ignored in the manner here indicated.

It is not clear from the evidence, that William's share of the profits had reached $50.000.00 or even $20.000.00 at the time of the settlement. But whether this be so or not, any verbal

statement by Granville, that his brother's connection with the business was only to continue until he had made $50.000.00, was merged in or abrogated by the contract of June 2, 1868. That contract fixed the rights of the parties and entitled William to claim whatever his "equal one-half interest" might amount to, whether $50.000.00 or $100.000.00.

We do not think it necessary to discuss the different accounts given of the destruction of the contract. The evidence is close and conflicting. The trial Judge saw the parties and heard them testify. We are not prepared to say that he did not reach a correct conclusion in regard to the fact of the settlement and in regard to the other facts in the case, including those hereinafter referred to.

In January 1874 William met with a Railroad accident and was confined for a long time to his house in Waukegan by sickness. He was visited by Granville in the spring of 1874 and, during such visit expressed the fear that he would not get well. Shortly afterwards he wrote to Granville and requested the latter to convey his interest in the State Street property to his three children. On May 11, 1874, Granville wrote in reply, denying that William had any interest in the property, and saying that, if he "got anything farther, it would be at the end of a lawsuit." William swears that this letter was the first intimation he had ever had of Granville's claim to the ownership of all the Dyer tract.

Thereupon, on June 2, 1874, William filed in the Recorder's office of Cook County a written notice or certificate wherein, after describing the Dyer tract and reciting the conveyance by Dyer to Granville Ingraham, and after further reciting the contract of June 2, 1868, it is made known and declared that Granville holds the land for the joint use and benefit of himself and William Ingraham, etc. Thereafter on June 25, 1874, William filed a bill against Granville in the Circuit Court of Cook County setting up and claiming his rights in the State Street property. This bill was answered, the issues were made

up, depositions were taken and the suit was pending until April 1879. Various reasons for not bringing the case to a hearing are given in the record, among which were the continued sickness of William and the death in 1877 of his solicitor, Mr. Joseph P. Clarkson.

On April 21, 1879, William voluntarily dismissed the bill so filed in 1874. This was done in pursuance of an arrangement made between himself and his brother on April 3, 1879, at the Commercial Hotel in Chicago. The two brothers then and there had an interview with each other for the first time since 1874. What took place is a matter of dispute between them, in reference to which they flatly contradict each other.

Granville swears, that he came in from his home at Hyde Park to meet William at the hotel at the latter's request, and that William at such meeting expressed regret for having begun the suit, and, of his own accord, offered and agreed to dismiss it without exacting any consideration or any promises of any kind in return for such dismissal. William, on the other hand, swears that he was sent for to come in from his home at Waukegan to the hotel in Chicago at Granville's request; that he there met Granville on April 3, 1879; that Granville spoke of threats that Horne had been recently making to begin suit and set up an interest in the property, and of the necessity of ending the pending litigation between brothers and uniting their efforts to defeat Horne; that thereupon Granville promised to give William his interest under the contract in the Dyer tract if he would dismiss his bill; that he agreed to dismiss his bill in consideration of the promise so made by Granville; that the dismissal took place solely and only in consequence of the agreement and promise so made.

Several circumstances tend to confirm William's testimony upon this subject. In the first place, Charles Ingraham swears, that, on April 2, 1879, he heard Horne say, that he intended to begin suit against the Ingrahams and claim a third interest in the Dyer tract; that, as soon as he heard it, he went to

Hyde Park and informed Granville of it, and the latter requested him to go to Waukegan and arrange for an interview with William the next day at 100 Lake Street; that he did go to Waukegan that night and succeeded in bringing about the meeting of the next day. In the second place, if the agreement, made on April 3, 1879, for the dismissal of the pending suit, had been intended by William to be a surrender of his interest in the Dyer tract and a withdrawal of all his claims thereto, it would have been natural for him to make a quitclaim to Granville, or, in some other mode, to vacate the certificate or declaration of notice recorded on June 2, 1874. He did not do so.

But it is unnecessary to further discuss these questions of fact. We have only commented upon a few of the principal occurrences detailed in this long record of 1318 pages for the purpose of indicating some of the reasons, which have led us to a concurrence in the conclusion reached by the Court below.

The statute of limitations has no application to the claim of William Ingraham. It can only be pleaded against an accounting sought by one partner from another after the partnership has been dissolved. The statute does not begin to run during the continuance of the partnership. In the present case, it was agreed to hold the Dyer tract and make no sale of it. As to that tract the firm relation was prolonged and continued by mutual consent. The title was permitted to remain in one partner for the joint benefit of both partners. In *Askew* v. *Springer*, 111 Ill. 662, there was a partnership for dealing in city lots. After sales had been made amounting to $23.000.00, some lots yet remained unsold. An agreement to partition the unsold lots fell through. We there said: "Nor does the fact that a settlement was made of all other prior transactions without including this claim for commissions preclude appellee from asserting his claim, inasmuch as *other lands remained to be sold and the affairs of the firm were not closed.* Nor

does the plea of the Statute of Limitations apply, because the charges were, some of them, made fifteen or sixteen years since. The partnership was still in existence and its affairs were not closed. Until that has ceased to exist, the statute does not begin to run. If it were otherwise no account could be taken of long partnerships back of the period of the bar of the statute. Until a dissolution or an accounting by the partners neither has a right to sue for an accounting or for a balance, and the statute never begins to run until an action accrues."

Even if the cross-bill of William Ingraham be regarded as a suit upon the written contract of June 2, 1868, the bar of the 16 years' statute of limitations, which was then in force, would not be complete. The cause of action upon the contract could not arise as to the Dyer tract until October 26, 1868, when the Ingrahams became the owners of the property. The contract took effect upon the Dyer tract when the deed was made to Granville and not before. On September 13, 1884, when the cross-bill was filed, a period of 16 years had not elapsed since October 26, 1868.

If the relation between Granville and William, so far as the Dyer tract is concerned, be regarded as that of trustee and *cestui que trust*, the trust was an express one as manifested by the deed of October 26, 1868, in connection with the written contract of June 2, 1868. In case of an express trust, the statute of limitations does not apply until the trust is disavowed by the trustee and an adverse right or interest is insisted upon and made known to the *cestui que trust*. (*Hancock* v. *Harper* 86 Ill. 445; *Albretch* v. *Wolf* 58 id. 186). Granville did not disavow the trust until May 11, 1874; William at once asserted his rights by filing a bill on June 25, 1874. The suit of 1874 stopped, for the time being, the running of the statute. In April 1879, when the suit was dismissed, Granville reacknowledged the trust and withdrew his disavowal thereof and his adverse attitude towards his *cestui que trust*. The proof does not show any further disavowal or any further assertion

of a hostile claim on his part until the coming in of his answer to the cross-bill filed in 1884.

In view of the promptness of William Ingraham in asserting his rights whenever denied, we see no ground for the application of the doctrine of *laches*.

The decree of the Superior Court is affirmed.

*Decree affirmed.*